JOEL D. SIEGEL (SBN 155581)
joel.siegel@dentons.com
STEVEN R. WELK (SBN 149883)
steven.welk@dentons.com
ANDREW M. PENDEXTER (SBN 310752)
andrew.pendexter@dentons.com
DENTONS US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, California 90017-5704
Telephone: (213) 623-9300
Facsimile: (213) 623-9924

Attorneys for Plaintiff
SUSA Financial, Inc. dba FirstFunding, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUSA FINANCIAL, INC. dba FIRSTFUNDING, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL J. STRAUSS,<br><br>Defendant. | Case No. 8:23-CV-2127<br><br>**COMPLAINT FOR:**<br>1) **BREACH OF CONTRACT (GUARANTY)**<br>2) **BREACH OF CONTRACT (COOPERATION AGREEMENT)**<br>3) **FRAUDULENT INDUCEMENT** |

/ / /

/ / /

/ / /

## INTRODUCTION

Plaintiff SUSA Financial, Inc., dba FirstFunding, Inc. ("FirstFunding"), in its capacity as lender under the Warehouse Funding Agreement dated October 5, 2020 (as amended, restated or otherwise modified, the "Funding Agreement"), by and between FirstFunding and non-party Sprout Mortgage, LLC ("Sprout"),[1] and guaranteed by Sprout President and Chief Executive Officer ("CEO") Michael J. Strauss ("Strauss" or "Defendant"), hereby brings this action to recover (i) amounts due under Strauss's personal guaranty, (ii) damages from Strauss's breach of contract, and (iii) damages related to Strauss's fraudulent inducement of FirstFunding to do business with Strauss and his companies.

This is a straightforward case. Sprout has admittedly defaulted under the Funding Agreement, and Strauss unequivocally and without limitation guaranteed payment in the event of default in a written Guaranty:

> Michael Strauss irrevocably and unconditionally guarantees payment of [Sprout's] indebtedness to FirstFunding, as set out in the Warehouse Funding Agreement dated October 5, 2020.

Strauss has failed and refused to comply with his obligations under the Guaranty, and is now in material breach of that contract (and another, as described below).

FirstFunding alleges as follows.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) because this action is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

2. FirstFunding is a Texas corporation with its principal place of business in this district, at 1 First American Way, Santa Ana, California 92707.

---

[1] FirstFunding has filed a separate suit against Sprout in this Court: 8:22-cv-01864-JVS-DFM. That case is currently stayed pending Sprout's bankruptcy proceeding in the Eastern District of New York (8-23-72433-reg).

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

3. Plaintiff alleges on information and belief that Strauss is a citizen of the state of New York.

4. As alleged in detail below, the amount in controversy far exceeds $75,000, exclusive of interest and costs. FirstFunding is seeking to recover at least $10,769,248.80 in currently identifiable, known losses. This figure includes, among other things, borrower payments made to Sprout which were not forwarded to FirstFunding, as well as losses resulting from FirstFunding's efforts to mitigate its damages after Sprout's collapse, including absorption of principal discounts when loans were sold to third parties at a loss and value adjustments for Sprout-related loan assets.

5. This action arises out of Strauss's conduct directed at California.

6. Strauss is the President and CEO of Sprout, and directed and caused Sprout and its agents and employees purposefully to direct its activities at California, including California residents who could not obtain a qualified mortgage due to, among other things, their self-employed status, credit history or low credit score. Strauss controlled the actions of Sprout and made material misrepresentations to FirstFunding, as described more specifically below, both in his individual capacity and as the decisionmaker for Sprout, upon which FirstFunding relied to its detriment, resulting is substantial damages.

7. Acting at Strauss's direction, Sprout engaged Banc of California ("Banc of California"), which operates and transacts its business and maintains its headquarters in this district at 3 MacArthur Place, Santa Ana, California 92707, to participate in the activities directed at California by Strauss, which activities occurred all or in substantial part in this district. Strauss also has sufficient business or contacts within the State of California to justify jurisdiction under the United States Constitution and the California long-arm statute because, among other things, Strauss directed and caused Sprout to maintain a branch location (NMLS ID# 1969563) at 6501 Irvine Center Drive, Suite 250, Room No. 3, Irvine, California

92618, and to hold one or more bank accounts at Banc of California during the relevant period.

8. This Court has personal jurisdiction over Strauss because Strauss, individually and as President and CEO of Sprout, directed Sprout to engage in the conduct alleged in this Complaint, made material, affirmative misrepresentations to FirstFunding in his individual capacity and for his own personal gain, executed the contracts at issue (identified below) with FirstFunding, individually and in his capacity and President and CEO of Sprout, including an express written personal guaranty (guaranteeing the performance of Sprout thereunder on one of those contracts), and affirmed the terms and obligations of that guaranty in a subsequent contract with FirstFunding.

9. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because property that is the subject of the action is located in this judicial district, where a substantial part of the events giving rise to the claim occurred.

## PARTIES

10. FirstFunding is a wholly-owned subsidiary of First American Financial Corporation and offers warehouse lending facilities to mortgage lenders, banks, credit unions and secondary-market investors.

11. Strauss is Sprout's President and CEO, personal guarantor of the Funding Agreement, and a party to a separate Cooperation Agreement with FirstFunding.

12. Sprout, under Strauss's direction and control, was in the business of originating and then selling residential mortgage loans. At all relevant times, Sprout was licensed by the Department of Financial Protection and Innovation under the California Residential Mortgage Lending Act (CRMLA License No. 41DBO-157478) and registered to do business in California.

# FACTUAL BACKGROUND

## A. Sprout's Business and Activities

13. A non-qualified mortgage ("non-QM") is any mortgage that fails to meet specific standards of lending set by the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Dodd-Frank Act"), enacted in response to the 2008 subprime mortgage crisis.

14. Certain parts of the Dodd-Frank Act were rolled back when the Economic Growth, Regulatory Relief, and Consumer Protection Act was signed into law on May 24, 2018, creating an environment that allowed Strauss to found Sprout, a company that targeted underqualified borrowers who it approved for non-QM loans.

15. Strauss formed Sprout on February 27, 2019, and it became one of the fastest growing non-QM lenders in the space.

16. Strauss caused Sprout to originate residential mortgage loans by soliciting and securing borrowers and funding and then closing on loans to those borrowers.

17. In order to source the funds required to fund and close the mortgage loans it originated, Strauss caused Sprout to rely on several different warehouse loans (or lines of credit) to obtain advances, including from FirstFunding. A warehouse loan (or line of credit) is provided to mortgage lenders by financial institutions, and allows mortgage lenders to finance a loan, in whole or part, without using their own capital. The mortgage lender handles the application and approval of a loan but obtains the funds for all or a portion of the loan from a warehouse lender. The mortgage lender is required to provide a firm commitment from an investor for a sale of the loan subsequent to closing with the proceeds to be used to repay the warehouse lender. The mortgage lender earns profits through this process by earning points, origination fees, and any retained share of an interest in the loan.

18. The Funding Agreement contemplated, and the parties agreed, that when Sprout originated loans under the Agreement, it would sell the mortgage loans to Fannie Mae, Freddie Mac, Ginnie Mae, or other secondary market participants, and apply the sale proceeds to pay off the warehouse advances. The Funding Agreement required Sprout to repay the warehouse loans in full regardless of the amount received by Sprout through sale of the loan on the secondary market.

19. Banc of California performs administrative, compliance, and financial servicing activities arising from or related to Pledged Mortgage Loans. FirstFunding is informed and believes, and thereon alleges that Strauss has caused Sprout to withhold funds owed and payable to FirstFunding that are or were held in accounts at Banc of California, which serviced the mortgage loans in Sprout's closed-loan portfolio as well as mortgage loans Sprout sold into the secondary market, service retained. Banc of California's servicing activities included, among other things:

- calculating, holding and applying escrowed amounts;
- delivering customer statements;
- accepting and applying customer payments;
- providing customer service;
- collecting on defaulted accounts; and
- maintaining documents, files, records, servicing documents, servicing files, servicing records, data tapes, computer records, and other information pertaining to the past, present, or prospective servicing of the mortgage loans.

**B.  Execution of the Funding Agreement**

20. On October 5, 2020, Sprout and FirstFunding executed the Funding Agreement, by which FirstFunding extended a loan facility in the amount of fifty million dollars ($50,000,000) to Sprout. A true and correct copy of the Funding Agreement is attached hereto as **Exhibit A** and incorporated by this reference.

21. The same day, and in connection with the Funding Agreement, Strauss entered into an unconditional personal guaranty agreement (the "Guaranty") (*see* Ex. A, Funding Agreement, Ex. E at 49-51), by which Strauss unconditionally guaranteed Sprout's payment obligations to FirstFunding under the Funding Agreement. *Id.* at 50.

22. At Strauss's request, the parties modified the Funding Agreement on seven occasions, and Strauss was the Guarantor for each such modification. True and correct copies of the seven modifications are attached hereto as **Exhibit B** and incorporated by this reference.

23. FirstFunding thereafter advanced money to Sprout pursuant to the terms of the Funding Agreement.

24. The advances by FirstFunding were secured by the Pledged Mortgage Loans—*i.e.*, the mortgage loans and related collateral (including, without limitation, all related files, servicing files and servicing rights) that collateralized Sprout's obligations under the Funding Agreement.

25. Over the course of the relationship, FirstFunding became aware that Sprout's reselling of some of the loans subject to the Funding Agreement were taking significantly longer than expected. When Strauss was asked about these increasing delays, he provided personal assurances, individually as Guarantor, that FirstFunding would be paid. On at least one occasion, Strauss represented to FirstFunding that he was speaking with third-party lenders and their attorneys about imminent sales that failed to materialize. Strauss, individually as Guarantor, also made representations that Sprout was going to receive additional capital that would allow it to bring Sprout current on payments owed to FirstFunding. FirstFunding relied on these representations by Strauss, and which turned out to be false. Moreover, Sprout was now also selling loans at a discount, which, on information and belief, required Sprout to make up deficiencies by using funds obtained by Sprout from sales of other loans because Sprout lacked sufficient capital. As it turns

out, and despite Strauss's representations, Strauss was simply robbing Peter to pay Paul.

### C. Default of the Funding Agreement

26. On July 6, 2022, Strauss informed FirstFunding that Sprout was "going under" and that it would "cease operations." These admissions that Sprout was unable to pay its debts as they become due, and of the existence of a material adverse change in the financial prospects of Sprout each constituted an "Event of Default" under the Funding Agreement and under the Guaranty. *See* Ex. A at 30-32.

27. FirstFunding alleges, on information and belief, that during the period preceding and following Strauss's notification to FirstFunding of Sprout's imminent collapse, Sprout, at Strauss's direction, was continuing to receive funds from borrowers that were owed and payable to FirstFunding. Strauss, individually and as President and CEO of Sprout, failed to provide those funds to FirstFunding as required by the Funding Agreement and Guaranty, instead converting them to his own use, in violation of the Funding Agreement and the Guaranty. On information and belief, such payments were received beginning on or about July 7, 2022. FirstFunding alleges on information and belief that unbeknownst to FirstFunding, Strauss directly withheld his authority to allow payments to FirstFunding to be made, despite the fact that these same payments had been received by Sprout from the borrowers and Strauss knew the funds were required to be forwarded to FirstFunding.

28. Before and after the collapse of Sprout, Strauss continually provided false assurances to representatives of FirstFunding that it would be paid in full pursuant to the Funding Agreement. On or about August 30, 2022, Strauss caused Sprout to make a lulling payment to FirstFunding (that is, a partial payment in an amount well below the amount actually owed). The lulling payment, combined with Strauss's misrepresentations that FirstFunding would be made whole, were intended

by Strauss to cause FirstFunding to delay acting upon its rights under the Funding Agreement and Guaranty.

29. FirstFunding further alleges on information and belief that during the period preceding and following Sprout's collapse, Strauss caused Sprout to delay the sale of loans on the secondary market to avoid incurring losses that Sprout and Strauss would be required to repay, and did so knowing that this practice would result in significant damage to FirstFunding. Throughout the period that the Funding Agreement and Guaranty were in place, Strauss, individually and as Guarantor, made representations and warranted that FirstFunding would be paid all that it was owed. FirstFunding relied upon those representations to its detriment. On at least one occasion, Strauss falsely told a FirstFunding representative that he (Strauss, individually and as Guarantor) was going to secure outside capital to make FirstFunding whole.

## D. Execution of the Cooperation Agreement

30. On August 5, 2022, Sprout (through its President and CEO Strauss), Strauss (in his individual capacity), and FirstFunding executed an agreement with an effective date of July 6, 2022, whereby Sprout and Strauss agreed, among other things, that (a) "Sprout and Strauss are liable to [FirstFunding], without offset or defense, for the indefeasible payment in full of the Principal Indebtedness plus all costs, fees, expenses, interest and other charges, including but not limited to, attorneys fees under the [Funding Agreement], the Strauss Guaranty and this Agreement;" (b) "the obligations of Sprout have been guaranteed by Strauss under a certain Guaranty dated October 5, 2020;" (c) Sprout was already in default under the Funding Agreement, and the default was both continuing and not cured; and (d) that Sprout and Strauss would "cooperate with [FirstFunding] . . . in . . . exercising its rights and remedies under the [Funding Agreement] and applicable law" (the "Cooperation Agreement"). Ex. C at ¶¶ 2, 12, 14, 24). A true and correct copy of

the Cooperation Agreement is attached hereto as **Exhibit C** and incorporated by this reference.

31. In addition to agreeing that FirstFunding was permitted to immediately exercise all of its rights under the [Funding Agreement] and applicable law (Ex. C at 4 ( ¶ 23)), Sprout and Strauss "further acknowledge[d] and agree[d] that any and all such actions taken from time to time by [FirstFunding] are hereby approved and ratified by Sprout, including but not limited to: . . . (y) [FirstFunding] receiving Mortgage Loan proceeds directly from Sprout or any borrower under the Mortgage Loans or any purchaser of the Mortgage Loans; [and] (z) [FirstFunding] taking any action or doing anything necessary, as determined by [FirstFunding] in its sole and unfettered discretion, to cause the Mortgage Loan proceeds to be delivered directly to [FirstFunding.]" *Id*.

32. The Cooperation Agreement also expressly provided that Strauss would "promptly and duly execute and deliver any and all such further instruments and documents and take such further action as [FirstFunding] may reasonably request for the purpose obtaining the full benefits of this Agreement and of the rights and powers herein granted." Ex. C at 5 (¶ 26).

33. Strauss, individually, as Guarantor, and as President and CEO of Sprout, entered into the Cooperation Agreement as a ruse with the intent to cause FirstFunding to delay efforts to pursue its legal remedies.

34. Strauss, individually, as Guarantor, and as President and CEO of Sprout, never intended to work cooperatively with FirstFunding in good faith to resolve the defaults under the Financing Agreement and Guaranty. Instead, Strauss executed the Cooperation Agreement in order to lull FirstFunding into delaying action on those defaults so that, upon information and belief, Strauss could abscond with money that was rightfully owed to FirstFunding under the agreements. For months after the execution of the Cooperation Agreement, Strauss caused Sprout to continue to receive payments of funds from borrowers that were required to have

been paid to FirstFunding but were not. The retention of those payments was in violation of the Funding Agreement, Guaranty, and Cooperation Agreement.

35. Only Strauss knew that he never intended to comply with his obligations under the Cooperation Agreement or Guaranty.

36. Had FirstFunding known that Strauss never intended to work cooperatively with FirstFunding in good faith to resolve the default under the Guaranty, FirstFunding would not have entered into the Cooperation Agreement.

37. Predictably, Strauss has long since ceased working cooperatively with FirstFunding to effectuate the prompt disposition of the Pledged Mortgage Loans and reduction of advances under the Funding Agreement to maximize value.

38. Based on the above, Strauss is liable to FirstFunding, without offset or defense, for all damages suffered by FirstFunding, according to proof, plus all costs, fees, expenses, interest, and other charges, including but not limited to attorneys' fees, under the Cooperation Agreement and the Guaranty.

39. Strauss has further defaulted under the Cooperation Agreement and the Guaranty by failing to provide FirstFunding with copies of all documents, instruments, agreements, information, and files, including credit underwriting files and work papers, generated, or utilized by Strauss or Sprout in connection with any funding to Sprout by FirstFunding, including any Warehouse Interest acquired by FirstFunding.

40. All necessary notices required by the Cooperation Agreement, the Guaranty, and applicable law have been given by FirstFunding to Strauss or waived, and all applicable cure periods with respect thereto have expired.

41. Strauss remains in default under the terms and conditions of the Guaranty and the Cooperation Agreement, and these defaults relieve FirstFunding of any further obligation to make or extend any loan or advance to Sprout or provide any other financial accommodations to Sprout under the Funding Agreement or the Cooperation Agreement.

42. Despite demand, Strauss has failed and refused, and continues to refuse, to pay FirstFunding the amount of indebtedness due and owing under the Guaranty and the Cooperation Agreement, which is at least $10,769,248.80, exclusive of fees, costs, and other recoverable sums according to proof.

43. Even after breaching the various agreements with FirstFunding, Strauss has continued his abusive lending practices. Moreover, Strauss has been the subject of formal action outside of California by regulatory authorities. In or about February 2023, the Illinois Department of Financial and Professional Regulation suspended Strauss's loan originator license, which had been issued in December 2022.

44. As noted above, while Sprout has entered bankruptcy proceedings in the Eastern District of New York (8-23-72433-reg), upon information and belief, Strauss has not entered bankruptcy proceedings.

## FIRST CLAIM FOR RELIEF

**(Breach of Guaranty)**

45. FirstFunding hereby incorporates by reference each of its allegations contained in paragraphs 1-44 of this Complaint as if set forth herein.

46. Strauss "irrevocably and unconditionally" guaranteed payment of Sprout's indebtedness to FirstFunding under the Funding Agreement through the Guaranty and acknowledged his personal responsibility for the payment of all obligations of Sprout in the Cooperation Agreement.

47. FirstFunding has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the Funding Agreement and the Guaranty.

48. Strauss has breached the Funding Agreement and Guaranty as alleged above and, as a result, FirstFunding has been damaged as alleged above in an amount to be proven, but which amounts to not less than $10,769,248.80.

49. Strauss is personally liable for the monies owed by Sprout to FirstFunding under the Funding Agreement pursuant to the Guaranty.

WHEREFORE, FirstFunding prays for relief as set forth herein.

## SECOND CLAIM FOR RELIEF

### (Breach of Contract – Cooperation Agreement))

50. FirstFunding hereby incorporates by reference each of its allegations contained in paragraphs 1-49 of this Complaint as if set forth herein.

51. The Cooperation Agreement constitutes a separate, valid, and enforceable contract between Sprout, Strauss, and FirstFunding.

52. FirstFunding has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the Cooperation Agreement.

53. Strauss, individually and as President and CEO of Sprout, has breached the Cooperation Agreement by failing to fulfill his obligations under that agreement.

54. As a result of Strauss's breach of the Cooperation Agreement, FirstFunding has been damaged in an amount according to proof, but which amounts to not less than $10,769,248.80.

WHEREFORE, FirstFunding prays for relief as set forth herein.

## THIRD CLAIM FOR RELIEF

### (Fraudulent Inducement)

55. FirstFunding hereby incorporates by reference each of its allegations contained in paragraphs 1-54 of this Complaint as if set forth herein.

56. By executing the Cooperation Agreement and Guaranty despite having no intention to actually carry out any of the promises in those agreements, Strauss concealed material facts which he had a duty to disclose to FirstFunding.

57. Strauss intentionally concealed the fact that he never intended to comply with any of the terms of the Cooperation Agreement and Guaranty in an effort to defraud FirstFunding.

58. Among other things, when Sprout fell behind on payments, Strauss made personal assurances that FirstFunding would be paid (despite never intending to do so); represented that FirstFunding would be made whole in order to lull FirstFunding into executing the Cooperation Agreement; and falsely represented that he was looking into outside capital in order to make FirstFunding whole.

59. Had FirstFunding been aware of Strauss's true intentions, it would not have executed the Guaranty or the Cooperation Agreement.

60. As a result of Strauss's improper conduct, FirstFunding has been damaged.

WHEREFORE, FirstFunding prays for relief as set forth herein.

## PRAYER FOR RELIEF

For the foregoing reasons, FirstFunding respectfully requests:

a. That FirstFunding be awarded compensatory and punitive damages in an amount to be proven;

b. That Strauss be ordered to pay FirstFunding's reasonable attorneys' fees according to proof;

c. That Strauss pay the costs of court and expenses incurred by FirstFunding in this action;

d. That Strauss pay FirstFunding pre-judgment and post-judgment interest on the damages awarded, continuing until such judgment is paid, at the maximum rate allowed by law; and

e. Such other and further relief, whether general or special, at law or in equity, to which FirstFunding may be justly entitled.

| | |
|---|---|
| Dated: November 13, 2023 | Respectfully submitted,<br><br>DENTONS US LLP<br>JOEL D. SIEGEL<br>STEVEN R. WELK<br>ANDREW M. PENDEXTER<br><br><br>By:   /s/ Steven R. Welk<br>         Steven R. Welk<br><br>*Attorneys for Plaintiff* SUSA Financial, Inc. dba FirstFunding, Inc. |

125250732